T.C. Memo. 1999-177


UNITED STATES TAX COURT


MAY T. RAKOW, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18975-96.                          Filed May 27, 1999.


<u>Glen T. Dobosz</u> and <u>Marios N. Karayannis</u>, for petitioner.

<u>Karen P. Wright</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency in petitioner's Federal gift tax for the 1992 taxable year in the amount of $170,885.  The issue for decision is the fair market value of stock given by petitioner to her children and grandchildren.

Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioner resided in Elgin, Illinois, at the time the petition was filed.

Illinois Hydraulic Construction Co. (IHC) has been owned by the Rakow family since 1970. During 1992, IHC had outstanding 6,340 shares of common stock and no preferred stock. On October 1, 1992, petitioner gave a total of 1,780 shares of IHC common stock to her children and grandchildren. Petitioner reported the gifts of the 1,780 shares of IHC stock on a 1992 Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return. Petitioner's 1992 gift tax return valued the 6,340 shares of IHC common stock at $2,250,000, or $354.89 per share, on a minority basis. Respondent determined the value of the 6,340 shares of IHC to be $3,846,161, or $606.65 per share, on a minority basis.

IHC is a general contractor engaged in the construction of industrial and commercial buildings, sewage and water treatment plants, and underground utilities, primarily in Northern

Illinois.  IHC obtained its work through bids.  Some requests for bids, such as those for public or municipal jobs, were advertised.  In contrast, the utilities, that is, the power and telephone companies, would send invitations to bid to IHC and other preselected companies.  IHC performed most of its contracts alone, without subcontracting significant portions of the work.

IHC has done work for the utilities for about 50 years.  Two of its major clients were Ameritech, a telephone company, and Commonwealth Edison, a power company.  In the 5-year period spanning fiscal years ended April 30, 1988 through 1992, these two major clients contributed from 33 to 49 percent of its revenues.

Thomas Rakow (Mr. Rakow), petitioner's son, has been president of IHC since the early 1980's.  Petitioner also was a full-time officer of IHC.  IHC paid Mr. Rakow and petitioner as follows:

| Year Ended | Mr. Rakow | Petitioner |
|---|---|---|
| Apr. 30, 1988 | $106,600 | $52,000 |
| Apr. 30, 1989 | 158,700 | 70,800 |
| Apr. 30, 1990 | 233,350 | 77,600 |
| Apr. 30, 1991 | 307,400 | 91,600 |
| Apr. 30, 1992 | 312,590 | 91,600 |

IHC's income statement for its fiscal year ended April 30, 1992, prepared by independent auditors, reports the following:

| | |
|---|---|
| Revenues | $24,519,021 |
| Cost of revenue | (21,574,516) |
| Gross profit from operations | 2,944,505 |
| Operating expenses | (2,539,992) |
| Income from operations | 404,513 |
| Interest expense | (50,430) |
| Other income (net of other expense) | 59,995 |
| Income before taxes | 414,078 |
| Provision for income taxes | (134,413) |
| Net income | 279,665 |

IHC's fiscal 1992 revenues represent a 5-year compound growth of 9.57 percent and a 3-year compound growth of 5.1 percent.  IHC's balance sheet for April 30, 1992, prepared by independent auditors, reflects assets of $7,624,578 and liabilities of $4,539,091, for a net worth of $3,085,487.  As of April 30, 1992, IHC had doubtful receivables of $19,109; this amount was excluded from the assets reported on the balance sheet.  IHC had a line of credit with a bank but had no outstanding long-term debt.

An analysis of IHC's income statements for its fiscal years ended April 30, 1988 through 1992, reveals the following, expressed in percentages of revenues (discrepancies in arithmetic are due to rounding):

| | 1992 | 1991 | 1990 | 1989 | 1988 | Average 1988-92 | Average 1990-92 |
|---|---|---|---|---|---|---|---|
| Revenues | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| -Direct costs | 88.0 | 88.0 | 89.4 | 86.6 | 91.4 | 88.7 | 88.5 |
| Gross profit | 12.0 | 12.0 | 10.6 | 13.4 | 8.6 | 11.3 | 11.5 |
| -Operating expenses | 10.4 | 9.8 | 8.5 | 10.9 | 7.5 | 9.4 | 9.6 |
| Operating profit | 1.6 | 2.2 | 2.2 | 2.4 | 1.1 | 1.9 | 2.0 |
| -Interest expense | 0.2 | 0.3 | 0.0 | 0.3 | 0.7 | 0.3 | 0.2 |
| +Other income(expense) | 0.2 | 0.4 | 0.4 | 0.3 | 0.7 | 0.4 | 0.3 |
| Earnings before tax | 1.7 | 2.3 | 2.6 | 2.5 | 1.1 | 2.0 | 2.2 |

OPINION

The issue for decision is the fair market value of the IHC stock given by petitioner on October 1, 1992. Both parties rely upon their respective experts' opinions in attempting to establish the correct fair market value.

Fair market value is defined as "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.'" United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting sec. 20.2031-1(b), Estate Tax Regs.). Expert opinion sometimes aids the Court in determining valuation; other times, it does not. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value in the record. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). We are not bound, however, by the opinion of any expert witness when that opinion contravenes our judgment. See

id. We may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion thereof, see Parker v. Commissioner, 86 T.C. 547, 562 (1986).

When valuing stock in the absence of arm's-length sales, the following factors are taken into consideration: The company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. See sec. 25.2512-2(f), Gift Tax Regs. The other relevant factors include:

> the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * [Id.]

Petitioner's Expert

Petitioner presented the opinion of George H. Reddin of FMI Corp., a management consulting firm to the construction industry (petitioner's expert). Petitioner's expert valued IHC on a minority interest basis at $2,161,467, or $340.93 per share.

Petitioner's expert first valued IHC according to the cost or asset approach. Beginning with the book value of IHC on September 30, 1992, of $3,397,339, he made downward adjustments for taxes ($138,005) and a "doubtful" account receivable

($140,666) and an upward adjustment to bring the book value of the depreciable assets to fair market value ($544,213). He also subtracted the cash value of insurance ($339,238), to be valued as a nonoperating asset. These adjustments resulted in an adjusted book value of $3,323,643 for the operating assets. In determining the adjustment to the depreciable assets, petitioner's expert used information on book values and estimated fair market values as of April 30, 1993, given to him by IHC's chief financial officer. Petitioner's expert believes the estimated fair market values were based on quick sale auction values. He concluded that IHC had no goodwill apart from its earnings capacity.

Petitioner's expert next valued IHC using a capitalization of earnings method. He adjusted IHC's pretax earnings upwards in some years and downwards in others to bring Mr. Rakow's salary in line with the industry average. Over the fiscal years 1988 through 1992, this adjustment averaged 0.14 percent of revenues, with a range of -0.5 to 0.5 percent of revenues. He then selected a capitalization rate, using the market comparable approach, a buildup approach, and FMI's experience. For the market comparable approach, petitioner's expert chose 14 publicly traded companies in construction or construction-related businesses and focused on their price/earnings (P/E) ratios. He derived each company's 1992 year range of P/E ratios from

Standard & Poor's Stock Reports.  Ignoring those P/E ratios over 25 and those not calculable due to losses or zero profits (which eliminated eight companies and truncated the range for one), petitioner's expert determined that the median of the midpoints of the companies' 1992 ranges of P/E ratios was a P/E ratio of 14.25.  Petitioner's expert then considered the following factors and made adjustments of unspecified quantities in the directions indicated below for an end result of a pretax P/E ratio in the range of 3 to 5:

| Factor | Adjustment |
|---|---|
| Market diversification | Down |
| Product diversification | None |
| Management depth | Down |
| Future earnings prospect | None |
| Financial strength | None |
| Access to capital markets | Down |
| Marketability | Down |
| Control | Up |
| Net effect | Down |

Petitioner's expert also calculated a capitalization rate using the buildup approach as follows:

| | | |
|---|---|---:|
| | Risk-free rate | 7.1 |
| + | Equity risk premium | 7.4 |
| = | Average market return | 14.5 |
| + | Risk premium for size | 5.1 |
| + | Other risk factors | 5.0 |
| = | Net cash-flow discount rate | 24.6 |
| + | Net earnings discount-net cash-flow discount | 0.0 |
| = | Net earnings discount rate | 24.6 |
| - | Average growth rate | 5.0 |
| = | Net earnings cap rate for next year | 19.6 |
| / | 1 + growth rate | 1.05 |
| = | Net earnings cap rate for current year | 18.7 |

Petitioner's expert started with the risk-free rate of return for the long-term Treasury bond on September 30, 1991. He consulted Ibbotson Associates 1992 Stocks, Bonds, Bills and Inflation Yearbook, to obtain the historical equity risk premium for stocks and the premium for small company stocks. He determined an additional premium of 5 percent was warranted when comparing IHC to the public companies. Petitioner's expert considered IHC's net income and cash-flow to be the same because its capital expenditures approximated depreciation. He assumed a growth rate of 5 percent. Petitioner's expert converted the after-tax capitalization rate of 18.7 percent to 31.2 pretax, using a 40-percent tax rate. He then concluded that the buildup approach yields a pretax earnings multiple of 3.2.

Petitioner's expert then stated that, in FMI's experience with actual transactions involving privately owned construction companies, the pretax P/E ratios ranged from 3 to 5. No data on these transactions appear in his report or elsewhere in the

record.  Ultimately, petitioner's expert concluded that a pretax P/E ratio of 4 is appropriate in this case, as it implies a pretax investment return in the absence of growth of nearly 25 percent, a return allegedly consistent with FMI's experience.

Petitioner's expert then applied this P/E ratio of 4 to various average and weighted average historic pretax earnings, to current pretax earnings, and to projected 1993 pretax earnings as estimated by IHC management.  As shown below, the results of the earnings approach were lower than the value of the operation derived through the asset approach.

| Method | Valuation |
|---|---|
| Book value (9-30-92) | $3,058,101 |
| Adjusted book value (9-30-92) | 3,323,643 |
| Capitalization of 5-yr. average adjusted earnings | 1,820,712 |
| Capitalization of 5-yr. weighted avg. adj. earnings | 2,128,296 |
| Capitalization of 3-yr. average adjusted earnings | 2,408,588 |
| Capitalization of 3-yr. weighted avg. adj. earnings | 2,355,660 |
| Capitalization of 1993 projected earnings | 2,000,000 |

It was petitioner's expert's opinion that the fair market value of IHC as an enterprise was $2,750,000.  When added to the nonoperating assets of $339,238, this resulted in a total value for IHC on a majority basis of $3,089,238.

Petitioner's expert determined a minority discount by consulting market data.  Using the median premiums paid for control for each year from 1980 to 1992 according to Mergerstat Review, petitioner's expert calculated the corresponding implied minority interest discounts.  These discounts ranged in value

from 21.7 to 30.8.  The 1991 average control premium was 35.1, the median premium was 29.4, and the minority discount corresponding to the median premium was 22.7.  The 1992 figures were 41.0, 34.7, and 25.8, respectively.  Petitioner's expert also looked at the Houlihan Lokey Howard & Zukin Control Premium Study.  That study reflected an average control premium of 47.6 percent and a median control premium of 44.5 percent for the third quarter of 1992, and average and median premiums of 51.2 and 43.5 percent, respectively, for the 12-month period ended September 10, 1992.  The third quarter of 1992 included 17 transactions, and the 12-month period ended September 10, 1992, involved 101 transactions.  Petitioner's expert converted the median premiums for these two periods to minority discounts of 31.5 and 30.0 percent, respectively.  Using the data from the two sources, petitioner's expert selected a minority discount of 30 percent.  He applied this discount to the value of IHC obtained above, leading to a value on a minority basis of $2,161,467, or $340.93 per share.

Respondent's Expert

Respondent relies on the opinion of Warren T. Jacobsen of Horizon Capital Management (respondent's expert).  Respondent's expert valued the IHC stock at $606.65 per share on a minority basis.

Respondent's expert first valued IHC using the market comparable approach. He selected nine public companies, on the basis of their products, markets, growth prospects, and risks, from the companies listed under Standard Industrial Classification (SIC) codes 1541/1542, general commercial contractors; 1799, special trade contractors; 1623, water, sewer and utility contractors; 1629, heavy construction; and 1791, structural steel construction. He determined the following market ratios for the nine companies: Price/revenue, price/earnings before interest and taxes (EBIT), price/net, and price/book value. In a few cases, the ratios could not be calculated because of deficit earnings. Respondent's expert calculated an average of the comparable companies' ratios for each type of ratio; he then calculated another such average eliminating the companies with the highest and lowest values for each type ratio; lastly, he adjusted the latter averages to fit IHC, the adjustments mainly representing the difference in size between IHC and the comparable companies. The resulting ratios were as follows:

|                        | P/Rev | P/EBIT | P/Net | P/Book |
|------------------------|-------|--------|-------|--------|
| Average                | 0.44  | 12.55  | 29.72 | 1.30   |
| Average excl. high/low | 0.44  | 10.90  | 24.34 | 1.05   |
| Conclusion (IHC)       | 0.30  | 10.00  | 20.00 | 1.00   |

Respondent's expert then calculated a value for IHC using these
ratios, weighting each of the four market comparison methods
equally as shown:

|  | Base | Multiple | Minority Value | Weight | Weighted Value |
|---|---|---|---|---|---|
| Price/revenue | $24,500,000 | 0.30 | $7,350,000 | 0.25 | $1,837,500 |
| Price/earnings | 300,000 | 20.00 | 6,000,000 | 0.25 | 1,500,000 |
| Price/EBIT | 500,000 | 10.00 | 5,000,000 | 0.25 | 1,250,000 |
| Price/book | 3,100,000 | 1.00 | 3,100,000 | 0.25 | 775,000 |
| Unadjusted value |  |  |  |  | 5,362,500 |

Because the market approach, based on individual shares, reflects
a marketable minority value, respondent's expert applied a
control premium of 30 percent and then a marketability discount
of 25 percent, for a result of $5,228,438, which he rounded to
$5,200,000. Respondent's expert selected the 30-percent control
premium on the basis of the 1991 average premiums of 35 percent
for all companies, 28 percent for contractors and engineering
services, and 45 percent for construction companies.

Respondent's expert also valued IHC using the discounted
cash-flow approach. This approach is based upon estimates of
future cash-flow discounted for the time value of money and
relative investment risks. Relying on IHC's 5-year and 3-year
averages and industry trends and forecasts, respondent's expert
used the following growth rates: Years 1 through 5, 5 percent;
years 6 through 10, 4 percent; post-year 10, 3 percent. He
projected direct costs to be 88 percent of revenues based on
historical results, industry averages, and anticipated economic

conditions.  On the basis of IHC's operating expenses (exclusive of depreciation), which averaged 7.7 percent of revenues for the last 5 years and 7.9 percent for the last 3 years, respondent's expert forecast operating expenses at 7.8 percent.  Depreciation was forecast at 1.5 percent of revenues.  He assumed a 40-percent tax rate for combined Federal and State income taxes.  For working capital, respondent's expert selected 5 percent of revenue, the industry averages being 5 to 7 percent and IHC's 5-year average about 5 percent.  After a review of historical results and discussion with management, he projected capital expenditures to equal depreciation in the long term, at 1.5 percent of revenues.  Respondent's expert developed a discount rate using a weighted average cost of capital for a capital structure of 80 percent equity and 20 percent debt, a structure intended to be reflective of the capital structures of companies in SIC codes 1541 and 1542; this resulted in a 13-percent discount rate.  The end result of the discounted cash-flow approach was a value for IHC of $4,800,000, rounded.

Respondent's expert then averaged the results of the discounted cash-flow ($4,800,000) and the market comparable approach ($5,200,000) for a value of $5 million, or $788.65 per share, on a majority basis.  The 30-percent control premium previously selected by respondent's expert translates to a minority discount of 23 percent.  Accordingly, on a minority

basis, respondent's expert concluded that a share of IHC stock is worth $606.65.

Court's Analysis

Not unexpectedly, each of the parties criticizes the opinion of the other's expert. We have considered each of the criticisms in our analysis.

Petitioner has presented an asset-based value, but with certain flaws in its methodology. Respondent's expert has not presented us with a value based on the asset approach, reasoning that because IHC is not a holding or investment company, the approach is not as appropriate as one based on income or market comparables. Also, respondent's expert opined that the asset approach is not as reliable for going concerns because of the difficulty of valuing intangibles.

The company's net worth is one of the factors to be considered, see sec. 25.2512-2(f), Gift Tax Regs., and the asset-based approach provides a value useful for comparison with the results of other approaches. Petitioner's expert began with IHC's September 30, 1992, balance sheet. However, there is little support for his $140,666 downward adjustment for the purportedly uncollectible receivable. Also, the adjustment for fair market value of the depreciable assets is based on the representation of IHC's management and quick sale values, rather than on independent appraisals of value in an orderly disposition

or as part of a going concern.  Considering these weaknesses, we believe that IHC's value calculated on the basis of its assets is greater than the $3.6 million postulated by petitioner's expert ($3.3 million in operating assets, plus $0.3 million cash value of life insurance).

The usefulness of the market approach is dependent on the comparables selected and the application of the variable chosen to the appropriate data.  We find that petitioner's expert's calculation of the P/E and price/book value ratios is flawed in that it does not focus on the period of time close to the valuation date but uses a median of the 1992 year ranges.  Also, he ignored all high values of these ratios.  He used 14.25 as the median P/E ratio of the comparables, but the exhibit in his report gives the median as "nm", or "not meaningful".  Petitioner's expert converted the after-tax P/E ratio derived from the comparables' P/E ratios to a pretax ratio and then misapplied the adjusted P/E ratio to various average and weighted average pretax earnings.  In a properly calculated market comparable approach, the comparables' P/E ratios are to be calculated and the selected result to be applied to the subject company on the same type of earnings; e.g., a P/E ratio determined on the most recent year's net earnings is to be applied to the subject company's most recent year's net earnings; a P/E ratio calculated on 5-year average earnings should be

applied to the subject's 5-year average earnings. See Zukin, Financial Valuation: Businesses and Business Interests, par. 2.8[2], at 2-30, par. 6.8[3], at 6-26 (1990). Because we find the P/E ratios and related computations employed by petitioner's expert to be unreliable, we disregard his conclusion that a P/E ratio between 3 and 5 is appropriate for valuing IHC.[1]

Petitioner's expert also developed a capitalization rate based on the buildup method. To the risk-free rate and equity premium, he added a small size risk premium and then 5 percent for other risk factors. Petitioner's expert describes the other risks as those factors which differentiate IHC from the public companies he selected as comparables, factors such as smaller geographical market, lack of management depth, and lesser access to capital markets. With the exception of control and marketability, most of the factors presented by petitioner's expert are those which differentiate a small company from a large one and already were taken into consideration by the small company premium. If we reduce petitioner's expert's capitalization rate accordingly and follow the remainder of his methodology, the resulting values are in the range of roughly

---

[1] Petitioner's expert also asserted that a pretax P/E ratio ranging from 3 to 5 was consistent with FMI's experience with actual transactions, but because no supporting data with respect to these transactions was provided in his report, we accord little weight to the assertion.

$2.0 to $2.6 million, rather than $1.8 to $2.4 million, though still substantially lower than the value of IHC's assets.

Petitioner attacks respondent's expert's use of a discounted cash-flow approach to value on the grounds that that approach, or any method based on a projection of future earnings, is not feasible in the construction industry because of risks inherent in the business, such as poor estimates, delays, litigation over accidents, defects, and nonperformance, and cyclical demand. Petitioner has not established that IHC suffers disproportionately from any of the risks mentioned. Earnings of the company are a factor to be considered in valuing stock. See sec. 25.2512-2(f), Gift Tax Regs. Careful selection of the input into the cash-flow analysis takes into account industry risks. Moreover, IHC's earnings for the 5-year period ending in fiscal 1992 do not suggest volatility. With the exception of a dip in fiscal 1989, IHC's earnings exhibited steady growth. Consequently, the projected growth rates used by respondent's expert in his discounted cash-flow analysis are reasonable, indeed, conservative. Thus, we believe that a discounted cash-flow analysis can be used appropriately to value IHC. The weight to be given to an earnings approach as opposed to an asset approach depends in part on the degree to which the company is actively engaged in the sale of goods or services, as opposed to being a holding or investment company. See Ward v. Commissioner,

87 T.C. 78, 102 (1986); <u>Estate of Ford v. Commissioner</u>, T.C. Memo. 1993-580, affd. 53 F.3d 924 (8th Cir. 1995). IHC was clearly the former.

Petitioner also attacks the methodology of respondent's expert's discounted cash-flow analysis. Specifically, petitioner criticizes respondent's expert's assumption of a pretax profit margin of 3.1 percent, when IHC's actual pretax profit margin averaged 2.0 percent for the 5-year period 1988-92. Challenged to explain the 1.1-percent discrepancy at trial, respondent's expert contended that the difference was attributable to the upward adjustment in earnings he made to account for excessive compensation paid to Mr. Rakow and petitioner during the period. We believe respondent's expert was mistaken in his testimony. His report makes no mention of excessive compensation. A review of his report suggests that the 1.1-percent difference between the 2.0 actual average pretax profit margin and the 3.1 pretax profit margin assumed in the discounted cash-flow analysis is attributable to--

(i) respondent's expert's selection of a direct cost percentage of 88.0 percent, rather than the actual 5-year average of 88.7 percent (for a difference of 0.7 percent); plus

(ii) respondent's expert's selection of a percentage for operating expenses (minus depreciation)

of 7.8 percent, rather than the actual 5-year average of 7.9 percent (for a difference of 0.1 percent); plus

(iii) the fact that (short-term) interest expense, which actually averaged 0.3 percent for the 5-year period, is disregarded in a discounted cash-flow analysis (for a difference of 0.3 percent).

These three factors appear to account for the difference between the 3.1 percent pretax profit margin assumed in respondent's expert's discounted cash-flow and IHC's actual 5-year average pretax profit margin of 2.0 percent. Thus the maximum adjustment that could have been attributable to excess compensation was 0.1 percent (i.e., the difference between the expert's assumption regarding operating expenses and the actual average), which is within the range that petitioner's own expert conceded that Mr. Rakow may have been overcompensated.

This is not to suggest that we believe respondent's expert's use of a 3.1-percent assumption for pretax profit margins in the cash-flow analysis is appropriate. To the contrary, we believe petitioner's expert's estimates understate direct costs, with the result that cash-flow, and the indicated value based thereon, are inflated.

As noted above respondent's expert assumed direct costs at 88.0 percent of revenues, notwithstanding the fact that IHC's 5-year average was 88.7 percent. In his report, respondent's

expert states that the 88.0-percent figure chosen was "based upon historical results, industry averages, and anticipated economic conditions". Yet historical results averaged 88.7 percent, and the industry average, according to the report, was 90.2 percent. If the assumed direct costs percentage is affected by the industry average, it should go up in IHC's case, not down. We find that respondent's expert's own data support an assumption of a direct costs percentage higher than 88.0 percent. If one were to take the average of the most recent 3-year and 5-year average direct costs (just as respondent's expert did with respect to his operating expenses assumption), the result would be a direct costs assumption of 88.6, rather than 88.0, percent.

We believe the record in this case supports the use of a higher direct costs percentage, which more closely approximates the historical averages experienced by IHC, than the one employed by respondent's expert. If one substitutes a direct costs percentage of 88.6 percent into respondent's expert's discounted cash-flow analysis, the indicated value for IHC as a whole becomes approximately $3.8 million, rather than the $4.8 million calculated by respondent's expert.

As recalculated, the $3.8 million value indicated by a discounted cash-flow analysis calls into question the other valuation approach employed by respondent's expert; namely, the market comparable approach. That approach indicated a value of

$5.2 million for IHC. Respondent's expert testified that a material difference in the results produced by the market comparable and discounted cash-flow approaches--which he defined as a difference of approximately 25 to 30 percent--would suggest that there was something "inherently wrong" that would cause him to review his assumptions. The difference between the values indicated by the discounted cash-flow approach (as herein adjusted) and the market comparable approach is $1.4 million, or approximately 39 percent. Respondent's expert further testified that as between the two valuation methods he used, the discounted cash-flow analysis was "more significant" than market comparables, based on his personal experience and his review of industry literature. In addition, we note that respondent's expert's use of the market comparable approach required him to make numerous adjustments to the ratios derived from the publicly traded comparables, in an effort to account for the substantially smaller size of IHC and certain Generally Accepted Accounting Principles applied to the financial reports of public companies. These adjustments appeared, in the end, somewhat arbitrary; in any event, respondent's expert conceded that they were based on his subjective determinations. In the Court's view, the adjustments necessitated by the size difference between IHC and the publicly traded comparables render the market comparable approach inherently more prone to error. On the basis of these

considerations, and respondent's expert's own stated preference for the discounted cash-flow analysis, we accord considerably more weight to its results, than to the results indicated by the market comparable approach.

On the basis of the foregoing, we conclude that respondent's expert's discounted cash-flow analysis, as adjusted to reflect more closely IHC's actual experience, provides the most reliable indication of value; namely $3.8 million. This figure is sufficiently close to the adjusted book value of IHC's assets (i.e., $4 million plus) that the two indications of value are reconcilable. Conversely, we think the $2.0 to $2.6 million value indicated by petitioner's expert's capitalization of earnings method is so divergent from the asset-based value that the former should be disregarded. We accordingly find that the value of IHC as a whole was $3.8 million on the valuation date.

We now consider the appropriate minority discount to apply in determining the value of petitioner's shares of IHC stock. The parties agree that the minority discount is the inverse of the control premium.

Respondent's expert reviewed 1991 control premium figures for the overall market (35 percent), general contractors (28 percent), and construction companies (45 percent), selected 30 percent as the appropriate control premium for IHC, and converted this to a minority discount of 23 percent. Petitioner's expert

selected a minority discount rate of 30 percent using overall market averages, one based on a survey of market activity recent to the valuation date and another being the highest median premium in the 12-year period including the valuation date. Generally, the average of all companies is not a good indicator of the subject company. See Northern Trust Co. v. Commissioner, 87 T.C. 349, 384 (1986). Although petitioner's expert does not present industry-specific control premium data, petitioner argues for using the control premium of construction companies (45 percent, which converts to a minority discount of 31 percent). As consistently reported in its audited financial statements, IHC performed most of its jobs on a stand-alone basis. Thus, it more closely resembles a construction company than a general contractor. Consequently, we agree that the 45-percent control premium that respondent's expert reports for construction companies is appropriately used for IHC. Accordingly, an inverse 31-percent minority discount should be applied to petitioner's IHC stock.[2]

Dividing the $3,800,000 value for IHC as a whole by the 6,340 shares outstanding results in a value of $599.40 per share.

_____

[2] Although the use of a 45-percent control premium would affect the value computed by respondent's expert under the market comparable approach, we need not consider this because of our conclusion that the market comparable approach is not reliable in this case.

Applying the 31-percent minority discount rate to this share value results in a value of $413.59 per share.  Accordingly, we hold that petitioner's shares were worth $413.59 each on the valuation date.

In keeping with our holding,

<u>Decision will be entered under Rule 155</u>.